KAREN L. O'CONNOR, OSB No. 953710
karen.oconnor@stoel.com
TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
RYAN S. KUNKEL, OSB No. 154671
ryan.kunkel@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

     Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TAYLOR LEMONS, individually and on behalf of all similarly situated individuals, | Case No.:  3:21-cv-00511-MO |
| Plaintiff, | |
| v. | **DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| WALGREEN PHARMACY SERVICES MIDWEST, LLC; WALGREEN PHARMACY SERVICES EASTERN, LLC; and WALGREEN PHARMACY SERVICES WESTERN, LLC, | |
| Defendants. | |

## I.  INTRODUCTION

Plaintiff seeks to certify a class consisting of "all employees of Defendant Walgreen

Pharmacy Services Midwest, LLC ["Walgreens"], whose employment terminated between

April 6, 2018 through the date of class certification," under a theory that Walgreens "had a practice of failing to timely pay its employees' final paychecks as required by Oregon law," by issuing "final paychecks at the next scheduled pay period."  Plaintiff's Motion for Class Certification ("Pl. Mot."), pp. 3-4.[1]  But the data does not support Plaintiff's theory nor does it show sufficient commonality for Plaintiff to meet his burden under FRCP 23.  To the contrary, the data demonstrates that each of Walgreens' dozens of Store Managers in Oregon processed separations in their own way, depending on the particular circumstances, and being human, they sometimes made mistakes, leading to imperfect data.  Plaintiff cannot meet his burden relying on imperfect data alone.

At oral argument on Plaintiff's Motion for Class Certification, the Court requested additional information from Plaintiff to address some of the challenges presented by the data. Plaintiff attempts to answer some of the Court's questions in his Supplemental Brief, but Plaintiff ignores the fundamental truth that data alone cannot meet the legal and evidentiary requirements to show a class should be certified, as illustrated by discrepancies in the data or obvious outliers that require an individualized inquiry to determine whether a purported class member received their final pay in a timely manner.  Such inquiries undermine Plaintiff's burden to show not only a potential pattern of untimely final paychecks, but also a common explanation as to why they were untimely.  *Wal-Mart Stores, Inc. v. Duke*s, 564 U.S. 338, 352 (2011) ("Without some glue holding the alleged reasons for all those [allegedly unlawful] decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why*." (emphasis in original)); *see* Defs'

---

[1] Though the ultimate merits of Plaintiff's claim are not before the Court at this stage, Walgreens strongly denies Plaintiff's allegations.

Opp., p. 11 (citing cases).  This Response evaluates the underlying circumstances of several

purported class members to demonstrate the futility of Plaintiff's effort to prove commonality

using only flawed data, which Plaintiff has now had years and a full discovery process to explore

and seek to redress, but has not.

Plaintiff still has not met his burden to show "questions of law or fact common to the

class" as required for the Court to certify a class, after a rigorous analysis, of separated

Walgreens employees who allegedly received their final pay late.  Plaintiff's Motion should be

denied.

## II.    BACKGROUND

At oral argument on Plaintiff's Motion for Class Certification on April 23, 2024, the

Court focused on Plaintiff's burden to show commonality, and stated that "I view commonality

as a concept that's not significantly undercut when the percentage of individual questions – of

people who have individual questions is low compared to the whole." (Oral Argument

Transcript, April 23, 2024 ("Tr."), p. 30.  "You could undercut commonality if, out of 561

people, you needed to know something individual – say you know, notice or something like that

– for, I'll say, 200 of them. But it would not undercut commonality, in my view, if you really did

have to – if the only way to know whether someone gave notice was an individualized inquiry,

maybe even through depositions, but you only needed to do that on ten out of 561 people, then

I'd say well, no commonality's not undercut."  Tr., p. 30.

To that end, the Court posed a number of questions for Plaintiff to answer:

1.  Whether depositions will be required to understand the circumstances of any

particular employee, or whether data alone is sufficient, Tr., p. 6;

2.  How many purported class members abandoned their jobs, Tr., p. 12;

3.  Whether records readily show which purported class members gave notice of resignation, Tr., p. 11;

4.  How many purported class members were allegedly paid their final pay more than six days late, Tr., pp. 7-8, 11;

5.  How many purported class members were separated with mutual agreement, Tr., p. 9; and

6.  How many purported class members received their final pay in cash, Tr., p. 10.

Walgreens submits this Response to help the Court answer those questions.

### III.    DISCUSSION

#### A.  Depositions are required to understand each employee's particular circumstances of separation and whether their final wages were timely issued

The Court noted that, though not a per se rule, one of the things to look for when determining "whether individual questions undercut commonality" is "will something like depositions be required?"  Tr., p. 6.  Here, depositions are necessary for a number of reasons.

As a threshold matter, the fundamental information Plaintiff needs to prove a final paycheck violation includes termination date, termination reason, and the date final wages were issued.  However, none of that information is reliably kept in common fashion.  As previously discussed, Walgreens does not keep a record of an employee's "termination" date, although it does have a record of the date that Store Managers subjectively identify as an employee's last day of work, recorded as "Separation Date/Last Day Worked."  *See, e.g.,* Defendants' Opposition to Motion for Class Certification ("Walgreens' Opp."), p. 13; *see also* Declaration of Corey Stephenson in Support of Defendants' Opposition to Motion for Class Certification ("Stephenson Decl."), ¶ 7; Declaration of Ryan Kunkel ("Kunkel Decl."), Ex. A (Terminated Employees tab, Column B).  While there are a number of reasons that Separation Date/Last Day

Page 4   -   DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF RE: PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Worked may not be an employee's actual termination date, *see* Walgreens' Opp., pp. 13-16, more fundamentally, that information may not even be accurate because it is data input subjectively by the individual Store Manager.

Sometimes Store Managers incorrectly indicate the Term Reason, which can turn an untimely final paycheck into a timely one depending on the circumstances.  *See* Stephenson Decl., ¶ 9.[2]  Sometimes Store Managers also seem to accidentally terminate someone.  For example, Employee ID 4077544 has a recorded Separation Date/Last Day Worked of July 12, 2019 and a Last Pay Date of August 22, 2019.  Kunkel Decl., Ex. B (Tab "Terminated Employees Paid Cash").  However, it appears that the Separation Date/Last Day Worked was in error, because the employee was rehired in the system on July 24, 2019, and regularly worked without a gap between that purported termination date to the present.  Declaration of Amber Dewey ("Dewey Decl."), ¶ 9.  There is nothing in the data other than the Separation Date/Last Day Worked that would indicate this employee was actually separated.  Understanding whether termination in fact occurred will likely require a deposition.

Similarly, for all voluntary separations, understanding whether and when an employee provided notice of resignation may also require depositions.  Employee ID 1627074 has a Separation Date/Last Day Worked of December 20, 2018, and a Last Pay Date of February 7, 2019, with a Term Reason of "Vol Separation – Resigned for Another Job."  Kunkel Decl., Ex. B (Tab "Voluntary Separation").  However, that employee's last day of actual work was November 10, 2018 as recorded in the timekeeping system (Kronos), and they missed more than a month of

---

[2] Even the data itself is subject to error.  For example, there are three purported class members apparently without a Last Pay Date.  *See* Kunkel Decl., Ex. B (Tab "Voluntary Separation," Employee IDs 2663985, 2868616, and 4084020).  Figuring out why will likely require a deposition of someone in payroll.

123619720.3 0009869-00012

scheduled shifts from November 17 to December 28.  Dewey Decl., ¶ 12.  Then, on January 23,

2019, the Store Manager processed the employee's separation and incorrectly entered the last

day of work into People Central as December 20, 2018.  Dewey Decl., ¶ 12.  Because the

employee had no hours worked, their final paycheck included only PTO, and was issued on

February 7, 2019.  Dewey Decl., ¶ 12.  That final pay may have been timely depending on the

circumstances, such as whether and when the employee gave notice of their resignation

(assuming the stated Term Reason of "Resigned for Another Job" is accurate), or whether and

when the employee abandoned their job and the Store Manager finally gave up on them returning

(as indicated by the employee's missed six weeks of shifts).  Whether the final pay was actually

timely requires an individual inquiry into this employee's circumstances, such as deposing the

Store Manager (who is not likely to remember this particular person from five years ago) and/or

the employee.

Notably, despite the obvious need to, Plaintiff has not taken a single deposition in this

case, despite filing the complaint in April 2021 and having until December 1, 2023 to complete

class discovery.  It is not for lack of documents, information, or time that could have led to

Plaintiff's apparent complacence: in June and July 2022, Walgreens produced information

related to the Separation Date and copies of what it believed were final paystubs for purported

class members who worked at Plaintiff's location; in December 2022, Walgreens produced

similar information and documents for purported class members who worked at a location in the

same District as Plaintiff; on May 21, 2023, Walgreens produced 562 paystubs, which Walgreens

believed to be the "final" paystubs, of purported class members statewide to Plaintiff.  Kunkel

Decl., ¶ 2.  Class discovery closed in December 2023 (after an original deadline of August 2021

and multiple extensions) without Plaintiff requesting more information about those 562 paystubs

or any of the information or documents Walgreens had provided related to the separations of the purported class members.  It was not until January 2024 when Plaintiff filed his Motion for Class Certification that Plaintiff claimed "[a]dditional information is required to determine if some of the employees are class members. For example, some checks provided are not the employees final wage check, some checks are blank, and some checks do not have the check or payment date included."  *See* Declaration of Carl Post in Support of Plaintiff's Motion for Class Certification, filed under seal ("Post Decl."), ¶ 3.  Additionally, the information available to Plaintiff demonstrated on its face that the underlying data demanded further inquiry – for example, the data indicated that one purported class member received their final wages 1501 days after their termination.  *See* Post Decl., Ex 2 (row 1).  That obviously is highly unlikely to be accurate and at the very least is not consistent with Plaintiff's theory that Walgreens issues final pay at the next regularly scheduled pay period.  There are numerous other examples throughout that exhibit prepared by Plaintiff's counsel that demand further individual inquiry, yet Plaintiff did nothing.  Walgreens was not aware of any alleged deficiency in the information and documents produced to Plaintiff; it pulled, as Plaintiff requested, what appeared to be the final paystubs issued to purported class members.  Kunkel Decl., ¶ 2.  Plaintiff knew or should have known for years, or at the latest seven months, before discovery closed that he claimed to need more information related to those final paychecks, yet he said and did nothing, and filed his Motion empty handed.  *Id*.  Plaintiff has had ample opportunity and repeated extensions to conduct discovery; it is too late for him to do so now.

This Court recently denied the request from a plaintiff – *represented by the same office as Plaintiff is here* – to extend the deadline to file the plaintiff's motion for class certification where the plaintiff had not been diligent in seeking the discovery that was necessary to support such a

motion – in particular, depositions. *See Boggs v. Onity Inc.,* No. 6:21-cv-00842-MK, dkt. 54 (order denying plaintiff's motion for extension of time to file class certification) (attached to Kunkel Decl., ¶ 9). Plaintiff should not be permitted to seek the discovery now that he should have obtained in the 32 months that class discovery was open during which he had all the information and documents that he now claims is deficient.

One insurmountable problem for Plaintiff's Motion is that Plaintiff has attempted to litigate this as a data-only case, which is simply not possible with a final paycheck claim. As the Oregon Court of Appeals noted in *Belknap v. U.S. Bank National Ass'n,* 235 Or. App. 658, 664, 234 P.3d 1041 (2010), when decertifying a class of people who gave 48 or more hours' notice of intent to terminate employment and who were not timely paid final wages (a much smaller subclass than the one Plaintiff proposes, of all terminations for any reason):

> While [the bank's] record keeping may have its problems, it appears that [the bank] has complied with the legal requirements of employment record keeping. The documents leave many different types of factual issues unresolved in most, if not all, of the some six hundred or more claims filed or expected to be filed. To resolve these factual issues, witnesses will have to be called and, in most if not virtually all cases, the resolution of one individual's factual issues will have no impact on resolving another's claim.

*Id.* at 662, 664 (brackets in original).

The circumstances presented here underscore the prescience of *Belknap.* Like the defendant in *Belknap*, Walgreens' payroll data does not neatly correlate to the elements of Oregon's final paycheck scheme (nor must it). As discussed in Walgreens' briefing to date and briefly again here, the payroll data does not indicate, for example, whether a separation was mutual or even an employee's actual termination date, both of which are critical to knowing whether a final paycheck was timely. But that is not an indictment of Walgreens or its record-keeping. The problem is not Walgreens' data, it is with the very idea of turning Oregon's final

paycheck timing law into a class action, which requires Plaintiff to show commonality among a

class of people whose separations are all unique, and where there is no objective data to show the

reasons for an employee's separation, their date of termination,[3] or even when they received their

"final" wages.  Rather, fundamental pieces of information for a final paycheck claim are based

on Store Managers' individual subjective interpretations, such as when the employee last worked

or should be separated, and whether their termination is voluntary or involuntary, and relies on

Store Managers entering that data accurately.  But they are human and make mistakes, leaving

the data unreliable or, at the very least, requiring inquiry and explanation.

For example, in some cases, the data appears to show a late final paycheck including all

final wages, but the individual circumstances for why the data shows that undermines Plaintiff's

burden to offer a common explanation.  Employee ID 2909933 has a Term Reason of

"Permanent Reduction in Force," and a Last Day Worked recorded as June 9, 2018, with a final

pay date of July 26, 2018.  Kunkel Decl., Ex. B (Tab "Involuntary Separation").  That final pay

included only vacation wages.  *Id*.  There are no regular wages on that final paycheck because

the employee's final wages for all hours worked was issued on June 28, 2018, and though the

employee's last day of work was June 9, 2018, the Store Manager did not record their separation

into People Central until July 20, 2018, which triggered payment of their accrued PTO, which

---

[3] This is not to suggest that there is a definition of termination date for the purposes of a
final paycheck claim.  Defendant is not aware of one under Oregon law.  Plaintiff claims that
*Wilson v. Smurfit Newsprint Corp*., 197 Or. App. 648, 107 P.3d 61 (2005), said "the last day
worked is the termination date."  Tr., p. 12.  Plaintiff reads *Wilson* too broadly.  Wilson did not
define the date of termination – rather, the trial court had concluded that November 10 was the
date of termination, and the Court of Appeals evaluated the meaning of "business day" for the
purpose of calculating timely payment under ORS 652.140(1).  *Wilson,* 197 Or. App. at 657.
Moreover, in that case, the termination was the result of the sale of the business, where
termination resulted from moving from the seller to the buyer – in other words, the last day
worked at the seller was easily identifiable and a natural "termination" date.  No such
circumstances are presented here.

was issued on July 26, 2018.  Dewey Decl., ¶ 11.  Even if the PTO was not timely issued, the circumstances here of the Store Manager administratively effectuating the separation weeks too late (which then triggers the PTO payout), undermines commonality because this individual Store Manager's mistake caused the untimely payment, not any particular policy or practice. That kind of individual action is not conducive to the common answer that plaintiff must offer to survive the rigorous certification analysis.  *Duke*s, 564 U.S. at 352 (evidence must show "common answer to the crucial question *why*" alleged violations existed (emphasis in original)); *Hargrove v. Sykes Enterprises, Inc.*, No. CIV. 99-110-HA, 1999 WL 1279651, at *4 (D. Or. June 30, 1999) (final paycheck class not certified because "plaintiffs were all allegedly paid late, but at different points in time and with no common pattern regarding how the payments were ultimately made" and "there could be a multitude of reasons for any such alleged failure").

Similarly, Employee ID 1663501 has a recorded Separation Date/Last Day Worked of June 14, 2019, but a Last Pay Date of June 13, 2019, and a Term Reason of "Invol Separation – Misconduct."  Kunkel Decl., Ex. B (Tab "Involuntary Separation").  If true, that means this employee was not paid at all for at least their last day of work.  But they were.  This employee received a cash payout on June 14, 2019 for their hours worked between June 6 and June 14, as well as their accrued PTO.  Dewey Decl., ¶ 8.  However, that cash payout does not appear in the payroll data until payroll processed it in August 2019, which was the result of a technological error.  *Id.* When a Store Manager issues a cash payout, an electronic file is sent to payroll indicating the payout so that payroll can update the employee's W-2 wages.  *Id.*  In this instance, there was an error transferring that electronic file that was not rectified until August when payroll corrected the error in order to update the employee's W-2 wages.  *Id.*  In other words, the error did not affect the employee timely receiving their final wages, but it does impact the data.

Page 10   -   DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF RE:
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Finally, the circumstances of Employee ID 2102960 further illustrate the risk of relying on data alone.  This employee has a recorded Separation Date/Last Day Worked of May 18, 2019 and a Last Pay Date of May 16, 2019, with Term Reason of "Invol Separation – Attendance." Kunkel Decl., Ex. B (Tab "Terminated Employees Paid Cash").   However, this employee's actual last day of work, as recorded in Kronos, was April 18, 2019, and thereafter they appeared to have called out for multiple shifts, for which their Store Manager entered either PTO or sick time.  Dewey Decl., ¶ 10.  On May 1, 2019, the Store Manager paid the employee cash for four hours' wages, although the employee did not record any work time that day.  *Id.*  That is consistent with Walgreens' recommended practice to pay employees four hours' wages upon a termination meeting.  *Id*.  After May 1, 2019, the employee did not work, but the payroll system nonetheless added PTO accrued for the four hours' wages paid in cash on May 1, 2019, which was done in error – by Walgreens' policy, employees do not accrue PTO in their last pay period before termination.  *Id*.  Because of that error in calculating PTO, the employee received a check for $1.73 on May 16, 2019.  *Id*.  In short, the employee was timely paid their final pay, in cash, on the day of what appears to be (but can be confirmed only with a deposition) their actual termination (May 1, 2019), but the data reflects a different termination date with another (timely) payment of PTO that was done in error (and therefore would not constitute wages earned and owed and could not support liability).  While this example shows a timely final payment, it also highlights the challenge of relying on the data alone.

Importantly, none of the challenges posed by reliance on data alone would preclude any one of these individual employees from bringing their own final paycheck claim.  The answers to when they were terminated and why, and when they received their final wages, are easy to determine – simply depose the employee and Store Manager.  But that is not possible in a final

paycheck class action, which is likely why, to Walgreens' knowledge, there has never been a

final paycheck class that has survived to trial.[4]

      The Court should heed the lesson learned in *Belknap* that a standalone final paycheck

claim is not appropriate for class treatment, and certainly not where the plaintiff relies on data

alone. *See Hargrove,* 1999 WL 1279651, at *4 (D. Or. June 30, 1999) (denying class

certification of standalone final paycheck claim). There are no requirements that Walgreens

maintain data to show compliance with Oregon's final paycheck statute. To the contrary, it is

Plaintiff's burden to prove that Walgreens has violated the statute, and additionally in the context

of his class claim, Plaintiff must show a common answer to explain any such violations in order

to certify a class. The data alone does not help Plaintiff do that. Data is simply data. The

insurmountable obstacle for Plaintiff is that the data alone leaves too many factual issues that

require witness testimony to resolve, and resolution of any one particular employee's situation

will not help the Court resolve the others. The Court should deny Plaintiff's Motion for

Certification.

### B.  Approximately 69 purported class members abandoned their jobs

      Sixty-nine out of 551 (or 12.5%) potential class members abandoned their jobs. *See*

Kunkel Decl., Ex. B. While Plaintiff identifies that number as 65, Plaintiff apparently counted

---

[4] There can be successful final paycheck class claims, but they always accompany
another claim that is conducive to class treatment, such as off the clock work or minimum wage
violations. *See e.g., Migis v. Autozone Inc.*, 282 Or. App. 774 (2016) (off the clock work and
final paycheck classes); *Gessele v. Jack in the Box, Inc.*, 427 F. Supp. 3d 1276, 1338 (D. Or.
2019) (minimum wage and final paycheck classes). That is different from Plaintiff's effort to
pursue a standalone final paycheck claim where the final pay policy is lawfully compliant, which
has never been successful. *E.g., Hargrove v. Sykes Enterprises, Inc.*, No. CIV. 99-110-HA, 1999
WL 1279651, at *4 (D. Or. June 30, 1999) (standalone final paycheck class not certified);
*Belknap,* 235 Or. App. 658 (standalone final paycheck class decertified).

only the Term Reason code "Vol – Separation – Job Abandonment," rather than another Term

Reason that also indicates job abandonment, such as "Quit – Walk off job." *Compare* Pl. Supp.

Br., p. 3 (citing Post Decl., Ex. C rows 185-243) *with* Kunkel Decl., Ex. B (Tab "Job

Abandonment"), ¶ 4. Accordingly, Walgreens asserts 69 is the correct number of job

abandonments. To the extent there is some question as to what was meant by the use of any

particular code, such as "Vol – Separation – Failure to apply for a leave of absence," that answer

could come only from a deposition of the Store Manager who input that data.

Although Plaintiff acknowledged that "[j]ob abandonment certainly would require

individual determination," Tr., p. 12, a brief exploration of the circumstances of some purported

class members illustrates why. For example, the data shows that Employee ID 4129143 has a

Separation Date/Last Day Worked of February 14, 2020, and a Last Pay Date of February 6,

2020. Kunkel Decl., Ex. B (Tab "Job Abandonment"). In other words, the data suggests this

employee received their final pay eight days prior to their last day of work, which means the

employee was not actually paid for at least their last day of work – but the data is wrong. This

employee was hired on January 15, 2020, and stopped working five days later, on January 20,

2020. Dewey Decl., ¶ 5. That employee was scheduled to work January 21, 22, 27, 28, and

February 4, but did not. *Id*. On February 15, 2020, 11 days after the employee was last

scheduled to work, the Store Manager entered into People Central that the employee's Last Day

Worked was February 14, 2020 (even though the employee did not work February 14 and in fact

had not worked since January 20), and entered their Term Reason as "Vol Separation – Job

Abandonment." *Id*. The employee's final paycheck was issued prior to that separation because

the employee had not worked any hours or earned any wages since that pay issued on

February 6, 2020.  The data alone does not reliably indicate when the employee's employment was terminated or whether and when they received their "final" wages.

As another example, Employee ID 3024559 has a Separation Date/Last Day Worked of March 20, 2019, a Last Pay Date of July 22, 2021, and a Term Reason of "Vol Separation – Job Abandonment."  Kunkel Decl., Ex. B (Tab "Job Abandonment").  The Store Manager entered the Separation Date/Last Day Worked on June 20, 2019, and backdated it to March 20.  Dewey Decl., ¶ 6.  The employee then received their outstanding PTO on July 11, 2019.  *Id*.  That employee was then rehired September 18, 2019 and remains a current employee.  *Id*.  Their "Last Pay Date" of July 22, 2021 is a reflection of the data collected as part of this lawsuit, and simply indicates the last pay date in that data set – in other words, because the employee continued to work from September 2019 through July 2021, their "last pay" within the data set collected was July 22, 2021, although that July 2021 paycheck was not their "final" paycheck for the purported March 20, 2019 separation.  *See* Kunkel Decl., ¶ 8.

In short, the data alone does not indicate the date of termination or the final pay for people who abandoned their jobs, and certainly does not provide Plaintiff with any evidence to meet his burden to show a common answer as to why these employees received their pay when they did.

### C.  The data does not readily show whether or when notice of resignation was given

Regarding voluntary separations, the Court noted that "if you could look and readily learn from employee records, without depositions, who gave written notice, then that goes less towards undercutting commonality because it's easily learned. If you can't do that, then it's something that requires more of an individualized determination."  Tr., p. 11.  Here, depositions are

required to understand who among the 402 people whose record indicates they voluntarily separated gave notice of resignation, and when.

There is no central record of whether and when notice of resignation was provided, or, even if it was, whether it was kept.  Stephenson Decl., ¶ 11.  The only potential record showing notice of resignation is an employee's personnel file.  *Id.*  However, even reviewing every single employee's personnel file will not provide the necessary information because it is impossible to prove a negative – the absence of a document providing notice will not prove that the employee did not provide notice,[5] nor is there any guarantee that any notice indicates either the date of the notice or the employee's anticipated date of termination.  Accordingly, review of 402 hard copy personnel files would be futile.

For example, for Employee ID 3048929, whose Separation Date/Last Day Worked was recorded as December 5, 2018, Last Pay Date is December 27, 2018, and Term Reason is Vol Separation – Personal Reasons (*see* Kunkel Decl., Ex. B (Tab "Voluntary Separation")), more information is needed to know whether that paycheck was timely, such as: (1) did the Store Manager correctly identify the Term Reason (e.g., was it actually a job abandonment and not personal reasons), (2) did the employee provide at least 48 hours' notice; (3) when did the employee provide such notice; and (4) when did the employee indicate they would leave Walgreens?  None of that information is available in the data, nor is it likely to be in their personnel file, and so depositions of the Store Manager and/or employee would be required.

/ / /

/ / /

---

[5] Indeed, there is no written notice in Plaintiff's personnel file, though Plaintiff claims he gave notice of his resignation.

### D.  The data does not reliably show the number of purported class members allegedly paid their final pay more than six days after alleged termination

Related to voluntary separations and whether notice was given, the Court inquired how many purported class members who separated voluntarily received their final wages more than six days after termination.  Tr., pp. 7-8 ("there isn't a common scenario of separation from work that allows Walgreens to pay somebody more than six days after termination").  On the face of the data, 54 purported class members who voluntarily separated received their final pay no later than five days after their last day worked.  Kunkel Decl., Ex. B (Tab "Voluntary Separation").  That is approximately 10% of the purported class of 551 people (54/551 = 9.8).  However, identifying the individuals paid more than five days after their purported termination is not alone sufficient to know whether that payment was timely.

As noted above, for all voluntary separations, the data does not show whether or when notice was given, or, if notice was given, when the employee stated would be their last day of work.  Knowing that date is critical to evaluating whether final pay is timely, even if the data suggests the final pay was six days or more after the last day worked.

For example, for Employee ID 1306898, their Last Pay Date is shown as December 12, 2019, and their recorded Separation Date/Last Day Worked was January 1, 2020.  Kunkel Decl., Ex. B (Tab "Voluntary Separation").  However, this employee's last day recorded in the timekeeping system (Kronos) was November 22, 2019 (in other words, their actual last day worked); on December 24, 2019, the Store Manager entered the Last Day Worked as January 1, 2020.  Dewey Decl., ¶ 7.  However, the employee did not work on January 1, 2020.  *Id*. Nonetheless, the employee was paid on January 2, 2020, $2.85 for PTO that was accrued based on the employee purportedly working on January 1.  *Id*.  That payment was in error – per Walgreens' policy, employees do not accrue PTO in their last week of work.  *Id*.  Importantly,

the fact that the employee's January 2, 2020 payment was not even owed to them pursuant to Walgreens' policy therefore would not constitute "final wages" such that could trigger a final paycheck violation.  Walgreens does not concede that such errors could lead to liability.  In any event, determining whether this employee was timely paid all final wages requires more information that is not available with the data alone.  If the employee gave notice of resignation on December 24, 2019 and said their termination date would be January 1, 2020, then the January 2, 2020 pay was timely; if the termination date was supposed to be between December 26 and 31, then it was not timely.  Accordingly, simply grouping everyone whose Last Pay Date appears to be more than six days after their Separation Date/Last Day Worked does not establish liability under ORS 652.240.

### E. The records do not show which employees were separated by mutual agreement

Oregon law provides that when an employee is discharged or when employment is terminated by "mutual agreement," final wages are owed by the end of the next business day. ORS 652.140(1).  Prudently, the Court asked how many of the purported class members were terminated by mutual agreement.  *See* Tr., p. 7.  There is no way to answer that question without individualized inquiries into the circumstances of every single purported class member.

"Mutual agreement," or anything similar, is not a Term Reason code available for Store Managers to select when processing a separation.  *See* Kunkel Decl., Ex. A.  Accordingly, Store Managers could have chosen any one of the Term Reason codes where the separation was mutual, and the discretion they exercised in making that choice could dramatically alter Walgreens' potential liability here – e.g., if the Store Manager chose a voluntary separation code, final pay was owed within five days, but an involuntary separation code would indicate final pay was owed within one day.  A brief review of the Term Reason codes does not reliably indicate

the circumstances of the employee's termination. Instead, depositions of each employee are necessary to understand whether the employee's separation was mutual.

### F.  Approximately 26 employees received a cash payment

Finally, the Court inquired as to the number of purported class members who received cash as their final pay.  Tr., p. 10.  The data suggests that 26 purported class members received cash as their final pay.  Kunkel Decl., Ex. B (Tab "Terminated Employees Paid Cash").

### IV.    CONCLUSION

For the foregoing reasons, and for those stated in Defendant's Opposition to Plaintiff's Motion for Class Certification, Plaintiff's evidence falls woefully short of his burden to prove many of the elements required to certify a class.  Walgreens respectfully requests the Court deny Plaintiff's Motion.

DATED:  June 14, 2024.

STOEL RIVES LLP

*s/ Ryan S. Kunkel*
KAREN L. O'CONNOR, OSB No. 953710
karen.oconnor@stoel.com
TIMOTHY W. SNIDER, OSB No. 034577
timothy.snider@stoel.com
RYAN S. KUNKEL, OSB No. 154671
ryan.kunkel@stoel.com
Telephone:  503.224.3380

Attorneys for Defendants